Filed 2/15/23  In re M.D. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.D. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. BRITTANY E. et al., Defendants and Appellants. | G061424 (Super. Ct. Nos. 21DP0541, 21DP0542) ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

This court hereby orders that the opinion filed here on January 19, 2023, be modified as follows:

1.  On page one, third paragraph, the first name "Patrick" is deleted and replaced with "Patricia."

This modification does not change the judgment.  The petition for rehearing is DENIED.

MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


DELANEY, J.

Filed 1/19/23  In re M.D. CA4/3 (unmodified opinion)
Corrected version

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.D. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>BRITTANY E. et al.,<br><br>        Defendants and Appellants. | G061424<br><br>(Super. Ct. Nos. 21DP0541, 21DP0542)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant and Appellant Brittany E.

Patrick K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant R. Garcia.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

*            *            *

Brittany E. (the mother) left M.D., her 12-year-old son (the boy), and S.E., her three-year-old daughter (the girl), alone and unsupervised in a Cypress hotel room for 20 to 40 hours. The Orange County Social Services Agency (SSA) filed a juvenile dependency petition. The girl's father, R. Garcia, resides in Mexico; the boy's father is not a party to this appeal. Following a contested dispositional hearing, the juvenile court removed the children from the custody of the mother and ordered reunification services.

The mother and Garcia appeal from the juvenile court's dispositional orders. (Welf. & Inst. Code, § 361, subds. (a) & (d).)[1] We find substantial evidence in the reporter's transcripts and SSA reports to support the orders; therefore, we affirm.


I

FACTS AND PROCEDURAL BACKGROUND

The mother has a history of substance abuse, specifically alcohol, with reports of her becoming aggressive when she drinks.[2] The mother also acknowledges being prescribed Adderall for Attention Deficit Hyperactivity Disorder, as well as an unknown medication for vertigo type symptoms. In 2006, when the mother was 18 years old, she was convicted of felony drug sales.

In 2009, the boy was born. When the boy was five months old, the boy's father broke his femur. The father was convicted of child abuse. The boy's father served approximately five months in custody and was on probation for seven years.

In 2017, the girl was born in Mexico. Garcia stated that before she was born, he and the mother enjoyed the night life, and the mother would occasionally use cocaine. Garcia indicated the mother was not a consistent user and would use on nights out maybe "once every two months." Garcia indicated the mother discontinued her

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

[2] The facts are largely based on various SSA reports filed with the juvenile court.

2

cocaine use after the girl was born. Garcia stated the mother consumed large amounts of alcohol. Garcia said the mother would at times "drink a bottle of vodka a day." Garcia said the mother made statements to him such as she would crash her car into a wall "at full speed." Garcia said he feels the mother struggles with depression.

Garcia stated the mother would often become upset when he would arrive home late. Garcia said the mother "liked to fight" and would have altercations with both men and women often when they went out. Garcia claimed he has never been in a fight where he was not "provoked." Garcia said the mother would often become physical with him. Garcia stated he would often tell the mother "not to pick fights with drunk people."

Garcia described an incident in which the mother stabbed him. Garcia arrived home late from work and the mother had thrown his clothes outside and broke the television. The mother was very angry and began yelling at Garcia. The argument continued in the kitchen. Garcia stated he did not feel the initial stabbing with the knife; however, Garcia "noticed blood from his torso and felt weak."

Garcia stated, "I'm not perfect. I was drinking." Garcia said he did not recall going after the mother with the knife and stated he "doesn't believe I did that." Garcia indicated his recovery from the injury took approximately one year, he had to have several surgeries, and his "stomach was left open for two months." Garcia said his life was at great risk, he received "sixteen bags of blood," and his mother sought support from the local radio station and friends to locate compatible blood donors.

Garcia initially was very upset with the mother and said he pressed charges against her. Garcia later decided he did not want the children to be without their mother, so he returned to the police station and retracted the charges. Garcia told the police he had fallen and accidentally stabbed himself in an effort to keep the mother from being prosecuted. Garcia said this was how he was able to convince the mother to bring the girl to visit him once more. The relationship had ended as a result of the stabbing.

3

On May 15, 2021, it was discovered the mother had left the children alone in a hotel room for up to 40 hours without arranging for their care and/or supervision. According to an investigating police officer, when the mother arrived, "she was very animated, and looked like she was coming down and had a rough night. The officer said it was like 'pulling teeth getting a statement from her, as she would go off on tangents.'" The mother was arrested for child endangerment and the children were placed in protective custody. SSA filed a juvenile dependency petition alleging a failure to protect.

*Detention Hearing*

On May 20, 2021, the juvenile court conducted a detention hearing. At the conclusion of the hearing, the court detained the children within the custody of SSA and authorized supervised visitation, which was conditioned on the mother "not being under the influence of any intoxicants. And this would include any use or overutilization of prescribed medications."

*Jurisdictional Hearing*

On September 23, 2021, a jurisdictional hearing commenced, and concluded on October 8, 2021. Prior to the hearing, SSA filed with the juvenile court a detention report, a jurisdiction/disposition report, and four addendum reports. SSA recommended that the petition be sustained.

The mother testified at the jurisdictional hearing. When asked if she had arranged for childcare when she left her children alone in the hotel room, "I personally didn't, but my – he wasn't my boyfriend, but I was kind of seeing him at the time. He was just like a friend, more like a friend. But he arranged, just to be safe -- because I wasn't feeling comfortable with them staying there, so he said, 'Well, she's kind of my aunt, she lives upstairs. She's been staying here for a while, and she helps take care of

4

my niece and everything else. She will be here just as peace of mind for you.'" When asked if she knew whether or not this person had a criminal history, the mother said, "I didn't know everything about his record. I know he did definitely get in trouble. . . . I don't even know what it was."

Prior to the hearing, the boy had reported to SSA that his mother had a former roommate, Justin, who beat her. The mother confirmed she was physically assaulted and thereafter moved out of that residence.

The mother said she left Mexico due to Garcia's domestic violence, which she said occurred during the entire time she was pregnant with the girl. The mother said Garcia "would get so drunk that he wouldn't know really where he was or who he was hurting." The mother said, "once the baby was born, that's when it got really bad." The mother said, "I was holding the baby when he tried to come at me, and I blocked it. I took the baby, and I took [the boy] and I left the country." The mother stated she returned to Mexico when the girl was about a year and a half old, but Garcia "ended up hurting me again when I was there, and I had to call the American Embassy and have them send Federales to come get me and [the girl] and get us out of there."

When asked what kind of work the mother does, she testified, "I buy and sell cars, and then I work for my friend. He's a producer, a music producer." When asked where she works, the mother responded, "Well, when the kids are with me, he sets up shop over at the Marriott in Palm Desert. He has the Villas on the golf course, and we just set up over there because the kids can all play. It's safe, and we just set up an office over there and we work and pretty much live over there, you know, during the summers or breaks for the kids. [¶] Other than that, like during regular school times when the kids are in school, I just run errands, pretty much, like assistant-like work. We're in the process right now of trying to do a car dealership together: me, him, and one other investor, but it's been kind of put on hold because of this. I'm an emotional wreck. I

5

can't -- you know, I can't think like how I need to think to do these deals."

Garcia testified at the jurisdictional hearing. Garcia said there had been domestic violence in the relationship with the mother. Garcia stated both of them consumed alcohol and partied, and the mother continued to drink during the time she was pregnant with the girl. Garcia said the boy was present during some of the incidents of physical violence. Garcia said he used marijuana.

At the conclusion of the jurisdictional hearing, the court found, "that the evidence demonstrates that mom did leave the children one to two nights alone, without adult supervision. I did not find mom's testimony credible regarding her recounting what had occurred. I'd note that the mom had provided two other versions of what occurred . . . and she told a third version in court."

The juvenile court stated: "What is undeniable is that mom left her kids unattended. She relied on a 12-year-old to watch her 4-year-old, and that this has happened on other occasions where she left her kids without adult supervision for hours at a time that occurred long before this particular incident occurred.

"The court also finds that there is more than adequate evidence that the mom has substance abuse issues. Again, the court did not find mom's testimony credible that she does not have a problem.

"From mom's prior social services contact history to the interviews and testimony in this case, as well as reports of mom appearing and behaving in a manner consistent with being under the influence, it is clear to this court that the mom does have controlled substance issues. While mom would like to portray herself in court as put together, the evidence demonstrates otherwise.

"The court does find that Mr. Garcia's testimony was credible, notwithstanding his own unrealistic view of his own controlled substance abuse issues.

"Per Mr. Garcia's testimony, it is clear that alcohol abuse was not one sided

6

when mom lived in Mexico as she portrayed. Per Mr. Garcia, mom also abused alcohol and also used cocaine prior to her pregnancy with [the girl].

"The court is mindful of the fact that [the boy] was with mom in Mexico while she was partying with the father. Furthermore, Mr. Garcia testified that mom continued to drink even after becoming aware of her pregnancy with [the girl], and continued to drink after [the girl's] birth."

The juvenile court also noted, "Mom's testimony regarding her Adderall use is quite concerning, as mom is not even using it as prescribed. Mom is supposed to be taking it twice daily, a medication that she's been prescribed for years, and she's taking it as she deems fit."

The juvenile court found "the evidence also is full of examples of mom exposing the children to violent relationships. While the court has no doubt that mom has been the victim of violent relationships, it also appears that she's been the perpetrator on occasions." The court was unable to conclude who, as between mother and Garcia, was responsible for the prior stabbing incident, but the court believed the mother contributed to the violence in their relationship.

The juvenile court also noted, "there is a monumental amount of evidence that Mr. Garcia has controlled substance abuse issues . . . . Mr. Garcia's own admission indicates that he has abused alcohol and marijuana for years. In the past it included using cocaine with the mother. Despite being stabbed and almost dying, which were clearly tied to excessive drinking and perhaps marijuana use as well, the father's apparent desire to sober up to have [the girl] in his care, he has not been able to go more than a week or two without drinking, if the court even believes that's a reality.

"Even though the father was fully aware that there is an open dependency case, the father continues to go out on weekends and drink to excess. While it is entirely possible that Mr. Garcia may not feel the same effects to drinking six beers as other

7

people do, it is a statement of how bad his alcohol issues truly are.

"Mr. Garcia's admittedly [has] not ever gotten help, and to his credit, he does appear willing to work on his issues. Nevertheless, the court has no hesitation in finding that he does, in fact, have controlled substance abuse issues . . . ."

The juvenile court sustained the allegations in the petition and assumed jurisdiction over the children (the court's findings at the jurisdictional hearing are not being challenged in this appeal).

*Dispositional Hearing*

On March 16, 2022, a contested disposition hearing commenced and concluded on May 3, 2022. Prior to the hearing, SSA filed with the juvenile court the previously filed reports as well as 10 additional addendum reports. The transcript of the prior jurisdictional hearing was entered into evidence by stipulation (a different bench officer presided over the current dispositional hearing). SSA recommended the children be declared dependents and that reunification services be provided for the mother and Garcia.

According to the SSA reports, the mother had been referred for drug testing, but she refused to participate in urine analysis. SSA arranged for drug patch testing, but the mother cancelled multiple appointments. In November 2021, the mother inadvertently sent text messages to an SSA social worker indicating she "was attempting to 'flush' her system prior to random drug testing." In January 2022, the mother tested positive for alcohol and amphetamines. Garcia tested negative for all substances, but he did not test for alcohol.

SSA social worker S. Herrera testified at the dispositional hearing. Herrera noted the children had been placed together with a family for the prior six months. Herrera opined there was a substantial risk to the children's safety if they were to be

8

returned to the home of the mother. Herrera stated the mother "has not had consistent drug testing. One of the reasons we came in is due to taking medication and leaving the children unsupervised. Considering the fact that she hasn't made most of her drug testing appointments, it's a concern."

Herrera noted the mother had been involved in at least three violent relationships with a partner or a roommate. Herrera was concerned the mother could end up in another domestic violence relationship because she had not taken any classes or counseling to address the continuing cycle of abuse. Herrera noted the mother had never acknowledged that such relationships presented a risk to the children. The mother also had never acknowledged that she had endangered the children by leaving them alone in the hotel room. In the last SSA report prior to the hearing, the mother accused Herrera of lying.

Herrera testified she had been in contact with the Mexican Consulate and Mexican National System for Integral Family Development (DIF) in order to provide reunification services for Garcia. Herrera testified she had been in constant contact with Garcia throughout the proceedings. Herrera testified Garcia had not yet addressed his domestic violence issues in any classes or counseling. Herrera recommended those issues be addressed as part of his case plan.

Garcia testified he had submitted eight drug tests, all of which were negative. Garcia said he thought the tests included tests for alcohol. Garcia initially stated he had not attended any 12-step meetings, but then testified he was attending once a week. Garcia testified on direct examination that he had last consumed alcohol in August 2021. On cross-examination, when confronted with his prior testimony that he last consumed alcohol in October, he admitted "I took a couple of drinks. I did." When asked to clarify, Garcia stated that he did not know when he last consumed alcohol.

At the conclusion of the hearing, the juvenile court found "reasonable efforts have been made to prevent or eliminate the need for the removal of the children from their respective homes." The court found by clear and convincing evidence that "to vest custody of each child with their respective parents would be detrimental to . . . each child." The court ordered custody of the children to be vested with SSA and ordered SSA to assist the mother in locating drug testing sites approved by SSA and convenient to her residence and schedule.

The juvenile court approved the case plan recommended by SSA, ordered visitation, and set the matter for further review hearings. The juvenile court ordered SSA to obtain the girl's birth certificate and to work with the Mexican Consulate to obtain an expedited passport for the girl. The court ordered funding for the expedited passport and for out of country services in Mexico. The court ordered SSA to coordinate with the DIF to obtain information regarding Garcia's services and tests.[3] The court ordered the SSA "to make best efforts to transfer this case to a Spanish-speaking worker forthwith."

II

DISCUSSION

A juvenile court's dispositional order removing a child from a parent is reviewed for substantial evidence. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1008-1009.) The parent bears "the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.) If substantial evidence supports the juvenile court's orders, we must affirm. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) We may not reverse simply because the evidence also supports a different finding. (*Ibid.*)

"In assessing how the evidence reasonably could have been evaluated by

_____

[3] The court's findings will be covered in detail in the discussion section of this opinion.

10

the trier of fact, an appellate court reviewing such a finding is to view the record in the light most favorable to the judgment below; it must indulge reasonable inferences that the trier of fact might have drawn from the evidence; it must accept the fact finder's resolution of conflicting evidence; and it may not insert its own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1008.)

The mother and Garcia appeal from the dispositional orders, which removed the children from the custody of their parents. In this discussion, we will: A) review general principles of law; B) quote at length the from court's findings at the end of the hearing; and C) analyze the record under the substantial evidence standard.

A. *General Principles of Law*

After a finding that a child is a person described in section 300 in a jurisdictional hearing, the juvenile court must hear evidence on the proper disposition of the child. (§ 358, subd. (a).) The petitioner (the social service agency) must prepare a social study addressing all matters relevant to a proper disposition and a recommendation for disposition. (§ 280.) The court is required to admit and consider hearsay evidence in the social worker's report. (*In re Corey A.* (1991) 227 Cal.App.3d 339, 346.)

A dependent child may be taken from the physical custody of a parent with whom the child resided at the time the petition was initiated if the juvenile court finds by clear and convincing evidence that there is a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being, or would be if he or she were returned home, and there are no reasonable alternative means to protect the child. (§ 361, subd. (c)(1).) "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child did not reside at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence that there would

11

be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent . . . to live with the child or otherwise exercise the parent's . . . right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the child's parent's . . . physical custody."  (§ 361, subd. (d).)

## B.  The Juvenile Court's Findings

At the conclusion of the dispositional hearing, the juvenile court made the following findings:

"The issues that brought this matter directly to the court were the issues that revolve around the children being left alone.  And the is that situation was prone the extent of the court would describe as the troubling issues and disfunction was further developed and involved significant, significant domestic violence relationships, and abusive relationships, and certainly the -- to the point where the minors were severely injured by his father.[4]

"The mother did leave a relationship, and also thereafter been involved any relationship with Mr. Garcia, and then this roommate the evidence.

"And there is no indication that there is either an insight into these domestic violence episodes.  And indeed, the court would make an independent refine that mother was a significant participant in a domestic violence issues that led to the stabbing of Mr. Garcia.

"This is a life-threatening event.  It is indeed troubling that she seemed to be holding the child at the time that the stabbing occurred.

"The fact that mother's is not currently in a relationship, it is certainly

---

[4] The reporter's transcript is quoted verbatim.  There are numerous apparent grammatical errors throughout the transcript; therefore, we have elected not to identify each specific grammatical error by use of the Latin word "sic."

12

something the court notes. But there is -- things are do change. And whether it's a roommate or a romantic relationship, one does not live in isolation. And one the readily anticipate that mother some fashion being in some type of relationship either with roommate or with a romantic partner where the issues, the underlying issues are likely to reassert themselves.

"The court would also agree that as part of this, the anger -- the anger issues is dramatically underscored by the most recent text message to the social worker and that the extent that establishes Mr. Garcia is striking. And makes accusations of lying on part of the social worker.

"And nobody is requiring, as part of the social services process, or court involvement with social services process, that they like their social worker or be polite to the social worker.

"And certainly, it is not significant, in terms of assessing risk, whether they like or do not like the social worker. What is demonstrated here is the degree of anger which is striking, and which allies the notion of responsibility for the issues that -- the relevant issues.

"The issues of drug abuse -- the court does note the findings and support and certainly would note the court would again, from the reading the transcript, would note that there was a substantive basis for the concerns.

"The fact that somebody would test positive for amphetamine when they have a prescription for Adderall is not surprising in some respects, but what is concerning is the high level the and issue of the issue of alcohol is also troubling.

"And again, the children were left in a situation that was -- compromise their safety. And one need look no further than mother's reaction the day that she reoriented herself to the degree that she concerned for the safety of her children, there's also a discerning aspect of the selection of who is going to care for the children. And the

13

mother commented that she did not be one proposed, the individual check-in would supposed to check with the children in the room.

"Again, this is suggestive of a tentative relationship which would have placed the only compromised the children's safety, even in mother's own life.

"The court would note there has not been any significant testing.

"The court understands that there was authorization for testing, but as it was subscribed at jurisdiction. These were funding for substance drug testing. And there is a pattern -- and the court would note that the mother, even simply in terms of the notion of I think it was the birth certificate, mother was to provide contact with the social worker contacted her, I think it was on the 19th, and mother assured that she would send the document in question and then recontacted mother, I believe it was a day later or two days later -- I believe it was a day later, and mother indicated she was out of town and was send it upon her return, and never did.

"And this was the type of pattern and behavior where mother -- and the court understands mother's potential concern about having this documentation provided to provide the passport which ultimately lead to the child's trip to Mexico, and certainly about her attitude about the trip to Mexico to visit the father. That there seems to be a type of positive aggressive behavior.

"The court would note the in terms of counseling. Again, the what is striking is the -- that one of the issues, apparently, that is significant to mother is her, the business where her financial situation being compromised as counsel has pointed out, the appointments, the visitation, and the drug test. Also pointed out and drug tests is not taking place. And in terms of the unavailability of mother that at times for visits and inconsistencies of visits in March and since Easter has been a suggestion that this may be attributable to the mother's business -- the demands of mother's business. And this is sort of tension with reference to the petition in reference to mother's complaint to her

14

therapist.

"What seems to be lacking is the core issues. The core features of this case that represent a risk, the present risk.

"And the court would agree, [county counsel], it's the court's responsibility to assess present risks. And I would think that the core issues here are one of substance abuse, and one of the issues of anger management, and domestic violence, history of relationships, and those do not seem either of those seem to have been added and they have an aspect where they can aggravate -- they can aggravate one another.

"It certainly domestic violence anger management issues could be aggravated by substances or drug abuse. And these do represent, and particularly given the history of this case, again, to the point where there was a fortuitus event that somebody wasn't killed, particularly in the stabbing situation. And one could suppose literally that would have a sobering effect.

"The again, in terms of mother's acceptance of responsibility, that there is a theme that is reflected not only in the text message, but throughout this, that it is the fault -- the fault lies elsewhere. And that she has not examined and addressed in any meaningful fashion, what she needs to do to keep her children safe.

"So the court is going to find that removal is appropriate for the mother."

As to Garcia, the juvenile court made the following record:

"The court is troubled by the services that were offered to Mr. Garcia who lived in an area with the significant -- individuals of Mexican heritage, Latino heritage that have connections to both to United States and Mexico. And certainly this case reflects that. That there is consultants available here in Santa Ana. There is a organization, and it is given the number of cases that do come before the court and to which social services would be an active participant.

"One would suppose that there would be have been well developed

15

protocols and procedures with reference to the what the court is going to describe as partnering with DIF to provide services to parents and family that have cross-border connections.

"And the court is going troubled that there was lack to a rather dramatic extent. The court would particularly troubled by the testimony developed during the trial, and certainly there has been some improvement since the jurisdiction hearing, but perhaps more improvement of length. The court would note that the presentation of the therapeutic services to [the father], the report that was submitted on behalf was certainly helpful. And it is certainly something that representatives positive steps forward.

"The court notes that the again, the issue is one of present risks of harm. And the court, in this instance -- the court would note that father also seeks to have – [the father] seems to have a more subtle appreciation for the needs and interests of his daughter. And even to the point where -- and he has expressed a desire to have custody of his daughter.

"He has also recognized the ties and the emotional connections that [the girl] has with her mother and her brother. And indicated that he would not be opposed to having safe return to mother.

"Again, I think this represents a very nuanced and appreciation for the emotional needs of his daughter and is to be loved. The court unfortunately does not concur that -- and again I want to make abundantly clear that [the father's] notion was that would not oppose a return of [the girl] if that could be done safely. That the court in its findings finds that is not appropriate.

"And the court would find that to return father, given the lack of opportunities for Mr. Garcia to have spent time with and sustain a relationship with his daughter has been significant. It undoubtedly has been complicated by the tempestuous level of the relationship that has existed between mother and Mr. Garcia.

16

"And one would be concerned that as to the conversations that -- and the stories that the child would have been exposed to, in terms of the father, and whether those then have exacerbated the difficulty of father developing a relationship with [the girl].

"That the, however, the obligation of the parent is to -- is to develop a meaningful relationship and to take steps to ensure that it is protected and that it's nurtured. The court is going to find in this instance that [the girl] cannot be safely returned to and maintained with Mr. Garcia.

"The court is also considered explicitly the issue of whether the children, both [the boy and the girl], can be safely maintained in mother's custody under the supervision of the court.

"The court is certainly sensitive to the issued orders and hopefully that will affect -- and the mother has been has uncooperative to a significant extent, which would indicate to the court this would not be a viable alternative.

"So, the court is going to make the findings, specifically, that the court is going to declare the children to be dependents of the Orange County juvenilecourt."

## C. Application and Analysis

A juvenile court may appropriately consider a parent's past conduct in deciding whether to remove a child from that parent's physical custody. (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.) "As other appellate decisions have held, a child need not have been harmed before removal is appropriate because the focus of the statute is on *averting* harm to the child." (*In re F.S.* (2016) 243 Cal.App.4th 799, 813, italics added, disapproved of on another point of law in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.) "Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm'

17

[citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

A juvenile court may also weigh the significance of a parent's past harmful conduct. (*In re I.J.* (2013) 56 Cal.4th 766, 778.) "'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . .'" (*Ibid.*)

Here, as the juvenile court noted, what brought this matter to the attention of the authorities to begin with is that the mother left her children alone and uncared for in a hotel room. SSA investigated the matter and determined that the mother had a history of substance abuse, which apparently contributed to her arrest for child endangerment. Further, after the children had been detained, and during the next several months, the mother was generally uncooperative with drug testing protocols and there was some evidence that on at least one occasion the mother had attempted to "flush" her system prior to the testing. One of the completed tests was positive for alcohol, which was identified as an issue in the sustained juvenile dependency petition.

The juvenile court also noted a significant history of domestic violence in the mother's prior relationships, which was again supported by the evidence. Indeed, the mother had exposed the children to at least three violent relationships. The abuse by the boy's father that resulted in the breaking of his arm was particularly alarming, as well as the stabbing incident, which potentially could have resulted in severe injuries to the girl.

The social worker Herrera testified that at the time of the dispositional hearing the mother had begun counseling services; however, there was no evidence the

mother was addressing the core issue of domestic violence, nor had the mother acknowledged the problem. Considering the evidence, the court's concern that these issues would likely reoccur seems well founded. There was also significant evidence of substance abuse and domestic violence issues on the part of Garcia, which also had not been adequately addressed at the time of the dispositional hearing.

In short, after reviewing the dispositional orders in the light most favorable to the juvenile court's ruling, we find substantial evidence in the hearing transcripts and SSA reports to support the court's dispositional orders, which removed the children from the physical custody of the parents. (See § 361, subds. (c)(1) & (d).)

The mother argues the removal orders were based on mere speculation by the juvenile court, primarily relying on the case of *In re Steve W.* (1990) 217 Cal.App.3d 10. We disagree. In *In re Steve W.*, an appellate court reversed a court's order, which removed an infant from the mother's custody. The infant's five-year-old half brother had been violently assaulted and killed by the infant's father. (*Id*. at pp. 12-15.) The appellate court reversed the juvenile court's removal order, in part, because at the time of the dispositional hearing the father was in prison, and the mother had begun counseling. (*Id*. at p. 22.) The appellate court determined: a) it was unlikely the mother would enter a relationship detrimental to the infant, b) less drastic alternatives were available to protect the minor, and c) it was speculative to suppose the mother (the nonoffending parent) might find herself in a similar relationship again. (*Ibid*.)

In this case, unlike *In re Steve W*., *supra*, 217 Cal.App.3d 10, the mother was the offending parent who was arrested for child endangerment. While the record disclosed the mother was a victim of domestic violence, the juvenile court also found her to be a "significant participant" with anger management issues. The children were apparently both present during the stabbing incident involving Garcia, and the boy had earlier suffered a broken femur at the hands of his father. The court also determined the

19

mother had substance abuse issues, which were not being monitored or addressed. Indeed, the Legislature has declared: "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment." (§ 300.2, subd. (a).) Thus, we find the case *of In re Steve W.* readily distinguishable and unpersuasive.

The mother also argues the juvenile court erred in failing to consider alternatives to removal of the children from her custody. We disagree. While the transcript is not entirely clear, the court stated it "also considered the explicitly the issue of whether the children . . . can be safely maintained in mother's custody, under the supervision of the court." The court noted "the mother has been . . . uncooperative to a significant extent, which would indicate to the court this would not be a viable alternative." Indeed, during her testimony, the SSA social worker Herrera opined there would be a substantial risk of harm if the children were left unsupervised in the mother's care, primarily because of the unresolved substance abuse issues, which was linked to the neglect of the children that initially brought the matter to the attention of SSA. Further, at the time of the hearing the mother had not yet provided evidence she was actually living at the address of the home that had been inspected by SSA.

Garcia argues: "The juvenile court's removal orders should be reversed because the agency failed to make reasonable efforts to prevent or eliminate the need for removal." (Capitalization omitted.) We disagree.

"A social services agency is required to make a good faith effort to address the parent's problems through services, to maintain reasonable contact with the parent during the course of the plan, and to make reasonable efforts to assist the parent in areas where compliance proves difficult. [Citation.] However, in most cases more services

20

might have been provided and the services provided are often imperfect.  [Citation.]  'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.'"  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599.)

The following are some of the entries made in various SSA reports as regards to contacts and efforts to provide services to the father (Mr. Garcia) who resided (and still resides) outside of the country:[5]

"On June 1, 2021, [Social Services Worker (SSW)] Herrera attempted to contact the father, [Mr.] Garcia at the phone number provided in Mexico.  There was no answer.  SSW Herrera was unable to leave a message as there was no voicemail."

"On June 2, 2021, SSW Herrera faxed the Request for Services to the Mexican Consulate so the father can be linked with services in Mexico."

"On June 23, 2021, SSW Herrera emailed Jessica Lopez at the Mexican Consulate of Santa Ana, requesting an update on the father, [Mr.] Garcia's services.  As of the filing of this report, there has been no response."

"On June 23, 2021, SSW Herrera contacted the Arizona Department of Children and Family Services . . . and spoke to a worker named Candy (last name unknown).  SSW Herrera requested assistance in locating services for the father.  Candy reported the department only work with clients who are currently involved with their department in Arizona.  She was unable to provide SSW Herrera with a list of services providers in the area.  Candy suggested the father contact the 211 line in Arizona for assistance in locating appropriate services."

"On June 23, 2021, SSW Herrera contacted the Family Service Agency; . . . . SSW Herrera was unable to leave a message, as voicemail was not set up."

"On August 23, 2021, SSW Herrera received an email from Jessica Lopez

---

[5] Boldfacing has been omitted throughout.

21

from the Mexican Consulate. Ms. Lopez explained the father would be contacted within the week to begin reunification services. The father will be working with DIF Puerto Penasco."

"On August 23, 2021, SSW Herrera received an email from the father, [Mr.] Garcia. The father wanted to know what he would need to do to have the child . . . moved to Mexico with him. SSW Herrera reported he would need to continue having positive [Zoom] visits with the child, as well as cooperate with DIF to complete services. The father stated he understood."

"On November 18, 2021, SSW Herrera sent an email to Jessica Lopez from the Mexican Consulate, inquiring about alcohol testing."

"On November 23, 2021, SSW Herrera received the border visit protocol documentation. SSW Herrera emailed the father, [Mr.] Garcia and informed him the visits could only take place on Mondays or Tuesdays between 9:00 a.m. through 12:00 p.m. The father did not provide a date he was available to visit."

"On November 24, 2021, SSW Herrera received an email from Jessica Lopez from the Mexican Consulate stating the laboratory where the father tested does not test for alcohol; however, DIF will attempt to locate another lab."

"On December 9, 2021, SSW Herrera received an email from the father, [Mr.] Garcia requesting an update. SSW Herrera informed the father the caregivers were willing to assist with border visits; however, the father needed to provide a date, as the protocol requires to provide a possible date for visitation. It should be noted the request takes approximately seven to ten days to receive a response from the Mexican Consulate. The father stated any Tuesday would work; however, the father asked for the visits to be early so he would be able to get home on the same day. SSW Herrera inquired as to where the father lived in relation to the border. The father stated he lives in Sonora, which is approximately an eight hour drive from the San Ysidro border."

"On December 14, 2021, SSW Herrera received assistance in translating the DIF home study for the father, [Mr.] Garcia. Certified Spanish SSW Karmin Contreras provided the following summary."

"It should be noted the Agency is still attempting to coordinate in person visits between the father [Mr.] Garcia and the child . . . ; however, the correct form could not be located. The Agency will be contacting the Mexican Consulate for assistance with this."

"On January 31, 2022, SSW Herrera contacted the San Ysidro border regarding visits and was able to speak to an English-speaking representative (name unknown). It was reported the border remains closed for visits due to COVID-19."

"On March 23, 2022, SSW Herrera emailed the parent education class schedule to the father, [Mr.] Garcia. SSW Herrera informed the father he would need to call directly to enroll. SSW Herrera requested the father inform SSW Herrera once he has enrolled in the program or to notify her if there were any concerns with enrollment. As of the filing of this report, the father has not responded."

"On March 30, 2022, Senior Social Services Supervisor M. Elena Valle contacted Sairi Gonzalez Lara with the Mexican Consulate at the Santa Ana Office. Mr. Gonzalez Lara explained he was aware of Senior Social Worker Stephanie Herrera's referral for the father [Mr.] Garcia. However, he explained the Mexican Consulate has been short staffed since the beginning of the pandemic. He furthered explained the National System for Integral Family Development or DIF was also affected by COVID-19 and they too are extremely short staffed. In addition, he shared the Mexican government does not provide the same services and resources a family would typically obtain in the United States under the Social Services Agency. He clarified when the Social Services Agency submits a referral for a parent residing in Mexico to obtain services; the parent is responsible for finding their own providers and paying out of

23

pocket. The parents then submit the results to DIF and they in turn send the information to the Mexican Consulate in the United States. He reiterated, this places a strain on families as they may live in isolated or rural areas of Mexico and/or do not have access or the means to seek these services being recommended by the agency or the Court. He again clarified, Mr. Garcia was referred to submit to random drug testing, parenting and possibly counseling. He noted Mr. Garcia paid out of pocket to have one drug test as there is no such thing as random drug testing in Mexico. He also shared finding counseling in Mexico is difficult to obtain. Mr. Garcia also completed a parenting class and had submitted proof of this to DIF who took a long time to inform the Mexican Consulate of this."

"On April 18, 2022, SSW Herrera contacted the US Customs and Border Protection - Lakeville Port of Entry, which is the closest border to Sonora, [Mexico]. SSW Herrera spoke to Supervisor Potter who stated 'definitely not' when asked about border visits. Ms. Potter explained their facility is a lot smaller than San Ysidro so there was no space to hold a visit and they also did not have the staff needed to complete border visits for children at this border."

Here, it is apparent there were numerous logistical difficulties in providing services to Garcia, in part, due to the pandemic; in part, because Garcia lives out of the country in Mexico. We share the frustration of the juvenile court that there do not appear to be "well developed protocols and procedures" in order "to provide services to parents and family that have cross-border connections."

However, given the scope of our review, it does appear SSA made "a good faith effort" to provide reasonable services to Garcia "'under the circumstances.'" (See *Katie V. v. Superior Court*, *supra*, 130 Cal.App.4th at pp. 598-599.) That is, we find substantial evidence to support the juvenile court's finding that SSA complied with its statutory obligations. In conclusion, we also note that all parties agree there is a strong

24

bond between the two children, which is supportive of the court's orders.  (See *In re Luke M*. (2003) 107 Cal.App.4th 1412, 1422 ["the statutes expressly authorize the court to consider sibling relationships when making its placement decisions"].)

## III

## DISPOSITION

The orders of the juvenile court at the dispositional hearing are affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


DELANEY, J.